IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AXIS INSURANCE COMPANY and          §
NATIONAL UNION FIRE INSURANCE       §
COMPANY OF PITTSBURGH, PA.,         §
                                    §
            Plaintiffs,             §
                                    §
VS.                                 §    CIVIL ACTION H-12-0178
                                    §
BUFFALO MARINE SERVICES, INC.,      §
                                    §
            Defendant.              §

## OPINION AND ORDER OF SUMMARY JUDGMENT

Pending before the Court in the above referenced declaratory judgment action, arising out of contamination of liquid petroleum cargo and involving two primary insurers and four intervening marine excess insurance companies disputing the number of "accidents" or "occurrences" at issue under the two Primary Policies, are the following motions:  (1) motion for summary judgment (instrument #18) filed by Intervenors New York Marine & General Insurance Company ("NYMAGIC"), Starr Indemnity & Liability Company ("Starr"), Liberty Insurance Underwriters "Liberty"), and Certain Underwriters at Lloyd's, London ("Lloyd's") (collectively, the "Excess Underwriters"); (2) cross motion and motion for summary judgment (#20) filed by Plaintiffs AXIS Insurance Company ("AXIS") and National Union Fire Insurance Company of Pittsburgh, PA ("National")(collectively, the "Primary Underwriters"); and (3) motion for summary judgment and cross motion for summary judgment

(#21) filed by Defendant Buffalo Marine Services, Inc. ("Buffalo Marine").

The parties have filed a joint stipulation of facts ("JSOF")(#17), which the Court hereby incorporates into this Opinion and Order, and which the Court briefly summarizes here. The parties agree that Buffalo Marine owns and operates four tank barges (Buffalo 101, Buffalo 250, Buffalo 251, and Buffalo 300) that are used to transport liquid petroleum cargoes around the inland waters of South Texas. Buffalo Marine does not manufacture, modify, produce, possess, own or sell the liquid cargoes. Periodically at the request of particular customers, as is customary in the trade in the Port of Houston and its environs, Buffalo Marine would transport cutter stock fuel oil ("cutter stock"), which is a liquid petroleum cargo that is compatible with bunkers,[1] Buffalo marine's usual liquid cargo. Because of this compatibility, it is customary in the southeast Texas region not to clean a barge after it has transported cutter stock.

At the request of Buffalo Marine's customer Trafigura AG d/b/a Trafigura AG, Inc. ("Trafigura"), on different dates each of Buffalo Marine's four barges transported a single load of cutter stock, which, unknown to Buffalo Marine, contained contaminants not

_____

[1] Bunker fuels are used to power ocean-going ships. #20 at p. 2. "Cutter stock" is used to thin or "cut" by dilution the viscosity of heavier petroleum products, including bunker fuels. *Id.* at n.1.

detectable by the tests normally used to determine if a tank barge is fit for the carriage of bunkers.  All four barges took on their loads of cutter stock from a common source, the KMTEX Marine Storage Facility in Port Arthur, Texas.[2]  The barges were not cleaned after carrying the cutter stock.  Before Buffalo Marine learned that the internal components of each barge had allegedly been contaminated by the cutter stock,[3] subsequent deliveries of bunkers in 2010-2011 by these barges to other customers, which Plaintiffs identify by name and date, resulted in the filing of insurance claims from Buffalo Marine's customers.[4]

---

[2] BUFFALO 250 loaded a cargo of cutter stock at KMTEX on July 22, 2010; BUFFALO 251, on October 24, 2010; BUFFALO 101, on December 24, 2010; and BUFFALO 300, on January 22, 2011.
    The JSOF details the individual movement and deliveries of the four Buffalo Marine barges.  Altogether the Buffalo 250 delivered one load of contaminated cutter stock and 8 loads of contaminated bunkers; the Buffalo 251, one load of contaminated cutter stock and one load of contaminated bunkers; the Buffalo 101, one load of contaminated cutter stock and four loads of contaminated bunkers; and the Buffalo 300 delivered one load of contaminated cutter stock and four loads of contaminated bunkers.

[3] Buffalo Marine represents that "as transporter and in accordance with local customs in the trade, Buffalo had samples of the contaminated cutter stock cargo tested which testing revealed no factors which precluded the receipt of the cargo at the KMTEX facility and subsequent transportation of that cargo." #21 at pp. 2-3.  After the contamination was discovered, "following its internal investigation and more sophisticated testing (which is not customarily performed in the trade) Buffalo learned that the internal components of the four barges were contaminated with acrylates and polymers, which are not customarily present in cutter stock." *Id.* at p. 3.

[4] Buffalo has filed suit in this district, also in this Court, against Trafigura AG, KMTEX, Ltd., and others for contamination of the liquid cargoes transported by Buffalo Marine's barges and all

-3-

The Primary Underwriters had issued two marine insurance policies (the "Primary Policies") to Buffalo Marine:  Policy No. MS-S 3211, in effect from November 7, 2009 until November 7, 2010, and Policy No. MS-S 3514, in effect from November 7, 2010 to November 7, 2011 (copies attached as exhibits A and B to Primary Insurers' Amended Complaint for Declaratory Relief (#4, 4-1, 4-2)). Each Primary Policy is a combined marine package policy providing insurance coverages for "HULL & MACHINERY/PROTECTION AND INDEMNITY/MARINE LIABILITIES."

The Excess Underwriters had issued four policies of marine insurance (the "Excess Policies") to Buffalo Marine:  Policies No. MS-S 3213(A) and MS-S 3213(B), in effect from November 7, 2009 until November 7, 2010 and Policies Nos. MS-S 3516(A) and  MS-S 3516(B), in effect from November 7, 2010 until November 7, 2011 (copies attached as exhibits A and B to Intervenors' Complaint in Intervention (#10)).  The Excess Liability ("Bumbershoot"[5])

ensuing damages.  Civ. A. No. H-11-1174.

[5] Investopedia.com defines a "bumbershoot policy" as

a specialized form of liability insurance. A bumbershoot policy is a type of umbrella coverage designed specifically to insure marine risks, but it can also include non-marine risks. Shipyards often use this type of policy, which provides protection and indemnity coverage as well as liability protection under the Longshoreman and Harbor Workers' Act. . . . The word bumbershoot literally means "umbrella." Hence the name for this type of policy, which is intended to cover all miscellaneous forms of liability just as a standard umbrella policy does for individuals or businesses.

Policies are excess to the Primary Policies issued by Plaintiffs, and the Excess Underwriters have no duty to reimburse defense expenses and/or indemnify Defendant Buffalo Marine until the Primary Policies have been exhausted.

At issue in this action according to Excess Insurers is the number of "accidents" or "occurrences" under the Primary and/or Excess Policies applicable to covered claims for loss, damage, expense and injury to product, resulting from maritime cargo contamination.

The Primary Policies each provide coverage in the amount of $1 million for "Any One Accident or Occurrence" in excess of a $25,000 deductible in any one occurrence and a $150,000 annual aggregate deductible.   Exhibits A and B at pp. 3-4 to Primary Insurers' Amended Complaint for Declaratory Relief (#4).  They provide that "each occurrence shall be treated separately, but a series of claims hereunder arising from the same occurrence shall be treated as due to that occurrence."[6]  *Id.*, Ex. A at p. 29, clause 3 ("Limit of Liability"); Ex. B at p. 30, clause 3.   The policies do not

_____

Bumbershoot policies can also provide insurance for collision and salvage expenses.

[6] Buffalo Marine points out that the Excess Insurers have left off the first part of the sentence, which in whole provides, "For the purpose of this Clause each occurrence shall be treated separately, but a series of claims hereunder arising from the same occurrence shall be treated as due to that occurrence." #21 at p. 4.  Buffalo Marine  submits that the issue here is the reasonable or expected meaning of the undefined term "occurrence" in the Primary Policies under the circumstances.  *Id.*

otherwise define the term "occurrence."

The Excess Policies provide $50 million of coverage "each occurrence" in excess of the coverage afforded by the Primary Policies. Exs. A, B, C, and D at p. 1 to Excess Insurers' Complaint in Intervention (#10). The Excess Policies expressly define "occurrence":

> "Occurrence" shall mean an event or a continuous or repeated exposure to conditions which unintentionally causes injury, damages or destruction during the Policy Period which was unexpected by the Insured. Any number of such injuries, damages, or destruction resulting from a common cause or from exposure to substantially the same conditions shall be deemed to result from one occurrence.

Exs. A,B,C, and D at p. 8, clause XII ("Occurrence") to #10. The Excess Policies require Buffalo Marine to keep the Primary Policies in effect, *id.* at p. 17, clause L ("Maintenance of Underlying Insurance"), and they state that the coverage of the Excess Policies is in excess of any other valid and collectible insurance available to Buffalo Marine. *Id.* at p. 19, Clause O ("other Insurance").

Each group or party argues for an interpretation that best serves its own financial interests. Plaintiffs AXIS and NYMAGIC, the Primary Underwriters, claim that because the contaminated fuel was delivered by four barges, there were four "occurrences." Defendant Buffalo Marine, the assured, argues that since it was not a manufacturer, owner, seller or distributor of the contaminated petroleum cargo and since the origin of all the contaminated cutter

stock was the same, i.e., a shore tank at the KMTEX facility in Port Arthur, Texas, there was only one "occurrence" for purposes of the deductible and limit provisions of the Primary Policies.  The Excess Underwriters disagree with the Primary Underwriters and Buffalo Marine, distinguish the two types of policies, and contend that the language of the Primary Policies indicates that an "occurrence" is comprised of all events, incidents or series of claims for which the assured is liable (i.e., the loading of the bunkers on top of the contaminated cutter stock and then delivering the contaminated bunkers) under the Primary Policies,[7] while under the Excess Policies, each separate loading and delivery of the contaminated fuel from the four barges would constitute a separate "occurrence."

## Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no

---

[7] Intervenor Excess Underwriters' Opposition (#23 at p.5) elaborates, "[I]f a barge delivers contaminated bunkers to a shore tank, and a number of ships receive contaminated bunkers from that shore tank, the damage to the shore tank and ships and the claims of the shore tank owner for cleaning the tank and the claims by the various ships that received the contaminated bunkers for the damages they sustained, and any judgments, settlements, fees, costs and expenses that follow will be treated as part of the same occurrence."

genuine issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." A dispute of material
fact is "genuine" if the evidence would allow a reasonable jury to
find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986). Initially the movant bears the burden of
identifying those portions of the pleadings and discovery in the
record that it finds demonstrate the absence of a genuine issue of
material fact on which movant bears the burden of proof at trial;
a "complete failure of proof concerning an essential element of the
nonmoving party's case necessarily renders all other facts
immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);
*Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990);
*Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of
evidence to prove an essential element of the nonmovant's case on
which the nonmovant bears the burden of proof at trial, the
nonmovant must then present competent summary judgment evidence to
support the essential elements of its claim and to demonstrate that
there is a genuine issue of material fact for trial. *National
Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712
(5th Cir. 1994). "[A] complete failure of proof concerning an
essential element of the nonmoving party's case renders all other
facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may
not rely merely on allegations, denials in a pleading or

unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

"Cases involving the interpretation of an insurance policy are appropriate for summary disposition." *SnyderGeneral Corp. v. Great American Ins.*, 928 F. Supp. 674 (N.D. Tex. 1996)(*citing Principal Health Care of Louisiana v. Lewer Agency, Inc.*, 38 F.3d 240, 242 (5th Cir. 1994)), *aff'd*, 133 F.3d 373 (5th Cir. 1998).

## General Relevant Substantive Law

An insurance policy is a contract and is subject to the rules of construction applicable to contracts generally. *Balandran v. Safeco Ins. Co. of America*, 972 S.W. 2d 738, 740-41 (Tex. 1998). The court's primary goal is to give effect to the written expression of the parties' intent. *Id*. "[T]he parties' intent is governed by what they said, not by what they *intended* to say but did not." *Fiess v. State Farm Lloyds*, 202 S.W. 3d 744, 746 (Tex. 2006)(emphasis in original). "Policy terms are given their ordinary and commonly understood meaning unless the policy itself shows the parties intend a different, technical meaning." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W. 3d 20, 23 (Tex. 2008); *see also Security Mutual Cas. Co. v. Johnson*, 584 S.W. 2d 703, 704 (Tex. 1979)("Terms used in an insurance contract are given their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical or different sense."). When a term is not defined in an insurance policy, courts use the plain, and generally accepted meaning. *Pennzoil-Quaker State Co. v. American Intern. Specialty Lines Ins. Co.*, 653 F. Supp. 2d 690,

701 (S.D. Tex. 2009), *citing Gonzalez v. Mission Am. Ins. Co.*, 795 S.W. 2d 734, 736 (Tex. 1990).  If a contract is worded so that the court can give it a certain or definite legal meaning, it is not ambiguous and the court may construe it as a matter of law. *American Manufacturers Mutual Ins. Co. v. Schaefer*, 124 S.W. 3d 154, 157 (Tex. 2003).  If a contract is not ambiguous, the court must enforce it as written.  *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W. 2d 587, 589 (Tex. 1996).  Extrinsic evidence cannot be considered when the policy language can be given a definite or certain legal meaning.

A contract is ambiguous when its meaning is uncertain and doubtful or when it is susceptible to two or more reasonable interpretations.  *Balandran*, 972 S.W. 2d at 741.  Whether a contract is ambiguous is a question of law.  *Candlelight Hills Civic Ass'n, Inc. v. Goodwin*, 763 S.W. 2d 474, 477 (Tex. App.--Houston [14th Dist.] 1988, writ denied).  An ambiguity does not arise simply because the parties disagree in their interpretations of it.  *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W. 2d 587, 589 (Tex. 1996).  *See also Forbau v. Aetna Life Ins. Co.*, 876 S.W. 2d 132, 134 (Tex. 1994)("[N]ot every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity.  Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to create an ambiguity.").

An ambiguity in a contract may be "patent" or "latent": a patent ambiguity is one evident on the face of the contract, while a latent ambiguity arises when a contract that is unambiguous on its face, but its meaning is uncertain when applied to the subject matter with which it deals and an ambiguity appears because of some collateral matter. *Atlantic Casualty Ins. Co. v. Ramirez*, 651 F. Supp. 2d 686, 695 (N.D. Tex. 2009); *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W. 2d 280, 282 (Tex. 1996); *Nat'l Union fire Ins. Co. v. CBI Indus.*, 907 S.W. 2d 517, 520 (Tex. 1995). An ambiguity exists only when the term cannot be given a definite and certain legal meaning and more than one reasonable interpretation applies. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W. 2d 587, 589 (Tex. 1996). Thus a court must first determine whether Texas law assigns a definite legal meaning to "occurrence" under the circumstances in this case. *H.E. Butt*, 150 F.2d at 530.

Parol evidence is not admissible to create an ambiguity. *Atlantic Casualty*, 651 F. Supp. 2d at 695, *citing Murphy v. Dilworth*, 137 Tex. 32, 151 S.W. 2d 1004 (1941). If an insurance contract is ambiguous, the court must adopt the construction favored by the insured, a/k/a the rule of *contra proferentum*. *Nautilus Ins. Co. v. Country Oaks Apartments, Ltd.*, 566 F.3d 452, (5th Cir. 2009), *citing Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W. 3d 20, 23 (Tex. 2008); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Hudson Energy Co.*, 811 S.W. 2d 552, 555 (Tex.

1991).

At issue in this case is whether one or more "occurrences" caused the damage, the determination of which affects the amount of coverage and/or the number of deductibles to be applied under the insurance polices involved.  Courts have taken three approaches to making such a determination:  the "cause" test; the "unfortunate events" test; and the "effects" test.  *Pennzoil-Quaker*, 653 F. Supp. 2d at 703.  The majority, including Texas courts, apply the "cause" test, under which the number of occurrences is determined by reference to the underlying cause or causes of the injury or damage, rather than the number of resulting injuries or damage claims.  *Id.* at 703-04.  The courts do not focus on an overarching cause, but on the event or events that give rise to the insurer's liability under the policy.  *Id.* at 704. In other words, under a liability insurance policy, the court looks to the events that cause the injuries and give rise to the insured's liability, not the number of injurious events.  *Id.*

The "effects" test, which Louisiana courts apply, focuses on the effects of the event:  if different parties are damaged by a series of events, the damage to each party is a separate occurrence.  *Id.* at 704 n.4.

Under the "unfortunate events" test, which New York applies, to determine the number of occurrences for deductible purposes the court focuses on whether multiple claims result from "an event of

-13-

unfortunate character that takes place without one's foresight or expectation." *Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1213 (2d Cir. 1995)(*citing Arthur A. Johnson Corp. v. Indemnity Ins. Co.*, 7 N.Y.2d 222, 228, 196 N.Y.S.2d 678, 683, 164 N.E.2d 486, 491 (1959)), *op. modified on other grounds on denial of rehearing*, 85 F.3d 49 (2d Cir. 1996).   To determine whether multiple incidents arise from a single occurrence or more than one occurrence, the court focuses on "'whether there is a close temporal and spatial relationship between the incidents giving rise to the injury or loss, and whether the incidents can be viewed as part of the same causal continuum, without intervening agents or factors.   Common causation is pertinent once the incident--the fulcrum of our analysis--is identified, but the cause should not be conflated with the incident." *Appalachian Ins. Co. v. Gen. Elec. Co.*, 8 N.Y.3d 162, 171-72, 831 N.Y.S. 2d 742, 747, 863 N.E.2d 994, 994 (N.Y. 2007); *Bausch & Lomb, Inc. v. Lexington Ins. Co.*, 414 Fed. Appx. 366, 369 (2d Cir. 2011).

### Intervenors' Motion for Summary Judgment (#18)

Excess Insurers point out that in *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955), the Supreme Court required that state law apply to issues of marine insurance law in the absence of well-settled federal marine insurance precedent.[8] Thus courts have resolved the issue of how many "occurrences" there

---

[8] Buffalo Marine agrees.   #21 at p. 9 & n.11.

were under a Protection & Indemnity ("P&I") policy by applying state law.  *In re Prudential Lines, Inc.*, 158 F.3d 65, 77 (2d Cir. 1998); *Exxon Corp. v. St. Paul Fire and Marine Ins. Co.*, 129 F.3d 781 (5th Cir. 1997).  The Excess Insurers maintain that since Buffalo Marine is located in Texas and all of the facts giving rise to this action occurred in Texas, Texas law applies.  None of the parties disagrees.

Excess Insurers identify as the issue, "Does the separate loading and delivery of each cargo of bunkers constitute a separate 'occurrence' under the Primary Policies?[9]"

Excess Insurers argue that the holding in *Maurice Pincoffs Co. v. St. Paul Fire and Marine Ins. Co.*, 447 F.2d 204 (5th Cir. 1971), controls here.  In that case Pincoffs unknowingly imported bird seed that had been contaminated in Argentina.  Pincoffs then sold it to eight separate dealers, who resold it to bird owners, whose birds ate it and died as a result.  The policy at issue in *Pincoffs* defined "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the

---

[9] Were the Court to finds such is the situation under the facts here, in essence it would be applying the "effects" test, which Texas has rejected.

standpoint of the insured."[10]  447 F.2d at 206.[11]  The Fifth Circuit

concluded, contrary to the district court's ruling, that the

"occurrences" that subjected Pincoffs to liability were the sales,

not the contamination from a single source.  *Id.* at 206.  It

reasoned that Pincoffs did not contaminate the seed but received it

in contaminated condition, and that if Pincoffs had destroyed the

seed before the sales, there would be no occurrence for which the

insured would be liable, but the sales of the seed created the

exposure to a condition resulting in property damage.  *Id.*[12]  The

appellate court concluded that each of the eight subsequent sales

and deliveries was a new exposure and another "occurrence."  *Id.*

Similarly, Buffalo Marine did not face liability merely because its

barges were contaminated; it incurred liability when it loaded the

_____

[10] This definition has affinity to the "unfortunate events"
test for "occurrence."

[11] The Primary Underwriters find *Pincoffs* inapplicable to the
instant case on the grounds that the "occurrence" wording in their
policies is not limited by terms such as "accident" or "per claim,"
but instead suggests "a broader or more inclusive net."  #20-1 at
p. 27.  They charge Excess Underwriters with suggesting that the
court should read "occurrence" as "per claim" and thus convert "the
'cause' test adopted by Texas into a minority 'effects' rule."  *Id.*

[12] Buffalo Marine argues that in *Pincoffs*, the court's decision
was based on the "events" or "incidents" of eight contracts of sale
of contaminated bird seed.  It insists there is no analogy to this
case in which there were seventeen occurrences as the "transporter"
of the contaminated bird seed was not a party (Pincoffs was a
distributor/seller of the product. If there is any analogy, it
would be to the contracts for transportation of the contaminated
cutter stock, which would support Primary Underwriters' assertion
that there were four occurrence.

bunkers into its contaminated barges and delivered the resulting contaminated fuel, i.e., the "liability arose from the event of its sale of the seed [delivery of the contaminated bunkers]." *Id.* at 207. Each of the subsequent seventeen deliveries provided a new exposure and another occurrence.[13]

Excess Insurers also cite *Lennar Corp. v. Great Am. Ins. Co*, 200 S.W. 3d 651, 681-82 (Tex. App.--Houston [14[th] Dist. 2006, pet. denied), *abrogated on other grounds, Gilbert Tex. Constr., LP v. Underwriters at Lloyd's London*, 327 S.W. 3d 118 (Tex. 2010), in which a homebuilder, Lennar, installed defective exterior insulation and finish systems ("EIFS"), manufactured by a third party, into homes. The court rejected Lennar's argument that installing the EIFS in the homes was a single occurrence because the product defect caused all the damage. It found that the fact that the EIFS were generally defective would not have caused Lennar to be liable to each homeowner, and only some homes were damaged by their installation; instead, Lennar, neither the designer nor the manufacturer of EIFS, became liable when it built and sold homes

_____

[13] The Primary Underwriters argue that *Pincoffs* does not apply here because it involved a general liability policy (as opposed to a marine P&I policy) with a specific occurrence of trigger of coverage and a definition of occurrence in the policy, neither of which is present in the Primary Policies in dispute here. In *Pincoffs* the "occurrence" is tied to "an accident"; that limitation does not exist in the Buffalo Marine Primary Policies. Moreover the reference to "occurrence" in the Primary Underwriters' policies contemplates that "a series of claims" can result from a single occurrence, language not present in the *Pincoff* policy. #20-1 at p. 15.

with EIFS and even then, only to those homeowners who experienced damage to their homes.  "[T]here was not one entrapment of water that caused damage to all the homes": an "EIFS's entrapment of water on a particular home caused the damage to that home only. Therefore, Lennar was exposed to a new and separate liability for each home on which EIFS was applied."  *Id.* at 682-83, *citing Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1212-14 (2d Cir. 1995)(stating Texas law would apparently support finding that application of asbestos to numerous buildings constituted separate 'occurrences' despite insured's argument that its course of manufacturing and selling asbestos products constituted one "occurrence").  The court opined,

> Under Texas law, courts apply a "cause" analysis to determine whether a set of facts involves one or more "occurrences." *Ran-Nan, Inc. v. Gen. Accident Ins. Co. of Am.*, 252 F.3d 738, 740 (5th Cir. 2001), *citing Goose Creek Consol. I.S.D. v. Cont'l Cas. Co.*, 658 S.W. 2d 338, 339 (Tex. App.--Houston [1[st] Dist.] 1983, no writ). Under the "cause" analysis, the proper focus in interpreting "occurrence" under a liability policy is on the number of events that cause the injuries and give rise to the insured's liability, rather than the number of injurious effects. *See id. (citing H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 530 (5th Cir. 1998); *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 206 (5th Cir. 1971).

200 S.W. 3d at 682.

Excess Insurers conclude that in the instant action, each separate loading and delivery of bunkers to seventeen customers constituted a separate "occurrence" and triggered a separate policy limit under the Primary Policies.

-18-

The language of the policies also supports this conclusion, insist Excess Insurers.   The Primary Policies only answer for matters for which Buffalo Marine "shall as owners of the vessel named herein have become liable to pay."   Buffalo Marine did not "become liable to pay" any third party when its own barges became contaminated, but rather became liable only when it loaded bunkers on top of the contaminated cutter stock residue and then delivered the contaminated bunkers to the seventeen third parties.   In addition the Primary Policies state that "each occurrence shall be treated separately but a series of claims hereunder arising from the same occurrence shall be treated as due to that occurrence." There are multiple claims arising out of each of the loadings and deliveries by Buffalo Marine.   As an example, the Excess Insurers point to Buffalo 300, which delivered a cargo of contaminated bunkers to a shore tank at the Bayport Terminal, after which different vessels received contaminated bunkers from that tank. The claims of the vessel owners whose ships received bunkers from that shore tank and the claim by the owner of the shore tank itself arise out of that single delivery by Buffalo Marine and would constitute a single occurrence.   The Primary Policies clearly distinguish "occurrences" from "claims."  While claims arising out of a single "occurrence" can be aggregated, the "occurrences" must be treated separately.

The Excess Insurers further argue that the Primary Insurers

could have protected themselves by defining "occurrence" as that term is defined in the Excess Policies:

> "Occurrence" shall mean an event or a continuous or repeated exposure to conditions which unintentionally causes injury, damages or destruction during the Policy Period, which was unexpected by the Insured.  Any number of such injuries, damages, or destruction resulting from a common cause or from exposure to substantially the same conditions shall be deemed to result from one occurrence.[14]

*See also Westchester Surplus Lines Ins. Co. v. Maverick Tube Corp.*, 722 F.  Supp. 2d 787 (S.D.  Tex.  2010),[15] in which the assured manufactured defective casing that was sold to an oil company and installed in multiple wells.  Construing language similar to that in the Excess Policies in the instant case (defining "'occurrence' as '[a]n accident including continuous or repeated exposure to substantially the same general harmful conditions that results in 'Bodily Injury' or 'Property Damage' that is not expected or intended by the 'Insured.'"), the court found there was only one occurrence because "[u]nder the causation theory, the determination of whether there was one 'accident' is whether there was one

---

[14] As they note in their opposition (#23 at p. 12), the Excess Insurers assert that "a policy that defines 'occurrence' in terms of repeated or continuous exposure to similar conditions is obviously intended to expand the concept of 'occurrence' to include conditions that give rise to liability-causing events and thus limit the number of 'occurrences.'"

[15] Although the court in *Westchester Surplus* applied Missouri law, it noted that "Texas law is consistent with Missouri law" on the issue of whether there were multiple "occurrences."  722 F. Supp. 2d at 794.

negligent act or omission [by the insured] that was the sole proximate cause of all the resultant damages." *Id.* at 795.   In other words, "occurrence" generally means the underlying cause of the injury rather than the number of injuries or claims.   In *Westchester Surplus*, the court focused on the cause of the accident rather than its effects, i.e., the number of injuries.   It opined that under this "cause" approach, for purposes of the Excess Policies "an insured's single act is considered the accident from which all claims flow":   although the defect in the insured's manufacturing process resulted in four defectively manufactured drill casings that damaged four separate wells, it found that all the damage flowed from the single manufacturing defect, a single occurrence, rather than eleven downstream sales of casing or its installation in the four wells.   The later events did not interrupt the causal chain.   *Id.* at 796–97.[16]

---

[16] Primary Underwriters find *Westchester Surplus* applicable here.   The "liability causing event" was the conduct of  Buffalo Marine in allowing cutter stock to be placed in its barges resulting in the contamination of the tank bottoms in the four barges, a "condition of defect" which "set the causal ball in motion"; neither the "sale of the casing or its installation" was a "liability inducing consideration."   #20-1 at pp. 18–19.   In *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Puget Plastics Corp.*, 649 F. Supp. 2d 613, 628 (S.D. Tex. 2009)(citations omitted), the court wrote,

> Texas law uses a "cause analysis" to determine whether a set of facts involves one or more "occurrences" . . . . The proper focus is on "the number of events that cause the injuries and give rise to the insured's liability, rather than the number of injurious effects. . . . . A single occurrence may result in multiple injuries to

Excess Insurers also rely on *In re Prudential Lines, Inc.*, 158 F.3d 65 (2d Cir. 1998),[17] in which 5,000 claimants alleged that they suffered asbestos-related injuries while working aboard Prudential's ships.   The deductible provisions in each policy provided that personal injury claims "are subject to a deduction . . . with respect to each accident or occurrence." *Id.* at 76.  The policies did not define "accident" or "occurrence," so the appellate court defined "occurrence" as ordinarily meaning "something that takes place," especially "something that happens unexpectedly and without design." *Id.* at 79.  The Second Circuit, applying an effects test, opined that "[t]he presence of asbestos aboard a vessel cannot be said to take place," but instead deemed

multiple parties over a period of time. . . . "[I]f one cause is interrupted and replaced by another intervening cause, however, the chain of causation is broken and more than one occurrence has taken place. . . . "The critical question is . . . whether the damages all resulted from one continuing source/cause." "Most courts have, on that basis, held that there is a single occurrence when multiple claims have arisen from the policyholder's manufacture and sale of the same product to many customers." . . .

This Court observes that Buffalo Marine did not manufacture the contaminating cutter stock here, but was merely a transporter, and it maintains that it was an innocent victim.  Thus *Prudential* is inapposite.  Moreover in *Prudential*, the Second Circuit applied a combined "unfortunate event" and "effects" test, while the Fifth Circuit and Texas employ a "cause" test.

[17] Buffalo Marine points out that this is a Second Circuit case regarding asbestosis exposure causing personal injury.  This Court is required to follow Fifth Circuit precedent, if it exists, and this case relates to local maritime insurance coverage.  #21 at p. 9 and n.10.

it a "condition," and "[t]he unfortunate event causing personal injury [and thus the occurrence under the policy] is the exposure of people." *Id.* It rejected the argument that there was only a single deductible for all asbestos-related injuries on board a particular ship. Instead the appellate court found that each claimant's injuries due to the presence of asbestos on the insured's ship arose from a separate occurrence, that each was an individual separate exposure of a claimant to asbestos at a different point of time during a policy period, and each was a separate "occurrence." It held that "[u]nder New York law, multiple injuries are grouped as a single 'occurrence' when they arise out of the same event of unfortunate character and occur close in time with no intervening agent." *Id.* at 81 (the "effects" test).

Excess Insurers analogize the instant case to that in *In re Prudential*. The presence of the contaminated cutter stock residue on board the Buffalo Marine barges was not something that "took place"; it was a "condition." Buffalo Marine did not incur liability because its barges were contaminated with cutter stock; it only incurred liability when it loaded bunkers onto those contaminated barges, contaminated the bunkers, and delivered them to a third party. The "unfortunate event" was the contamination of the bunkers belonging to a third party and the delivery of those

contaminated bunkers to other ships.[18]

In sum, contend Excess Insurers, the language of the Primary Policies and controlling authority compel the conclusion that each time Buffalo Marine loaded bunkers onto one of its barges and delivered them constituted a separate "occurrence" triggering a separate $1 million policy limit and deductible under the Primary Policies.

### Buffalo Marine's Motion and Cross Motion

### for Summary Judgment (#21)

---

[18] The Primary Underwriters (#20-1 at pp.16-17) distinguish the instant case from that in *Prudential*, in which the issue of "occurrences" was determined based on a course of dealings established between the P&I Club member and the Club, a finding of fact following the trial on the merits.  The Second Circuit found that the prior course of dealings between the Prudential and the P&I Club demonstrated that the parties tacitly agreed on an occurrence being found on a per claim basis.  153 F.3d at 627.  There is no course of dealings involved here.  Primary Underwriters also suggest there is some consensus in the legal community that cases involving bodily injury from occupational diseases, such as asbestosis, are *sui generis* and "are subject to underlying result driven agenda of maximizing potential victim recovery," as distinguished from property damage claims.  *Carpenter Plastering Co. v. Puritan Ins. Co.*, Civ. A. No. 3-87-2435-R, 1988 WL 156829, *4 (N.D. Tex. 1988)(In certain asbestosis cases "courts have fashioned a different interpretation of the term 'occurrence' in order to adequately address the unique problems presented by the health-related injuries. . . .  These cases support the notion of a 'continuing' occurrence, recognizing that the occurrence of an injury can be a continuing process beginning with inhalation of asbestos fibers and ending years later with the manifestation of the disease. . . .  Plaintiffs have failed to justify extension of this peculiar interpretation to a construction accident.").  Primary Insurers further note that *Prudential* involved a bankrupt policyholder in addition to numerous occupational disease claimants.  Thus it insists that *Prudential* is of questionable precedential value for determination of the "occurrence" issue in this case.

Identifying the issue in this case as the meaning of "occurrence" and incorporating the JSOF and the Primary Underwriters' statement of the parties' positions in their memorandum (#20-1) at pp. 4-8, Buffalo Marine focuses on Clause 3 of the Primary Policies and Clause XII of the Excess Policies. Clause 3 of the Primary Policies provides,

> Notwithstanding anything contained herein to the contrary, liability hereunder in respect of any and all loss, judgment, settlement, damage, costs, fees, expenses, claims or otherwise arising out of or in consequence of any one occurrence shall in no event exceed $1,000,000 per occurrence. For the purpose of this Clause each occurrence shall be treated separately, but a series of claims hereunder arising from the same occurrence shall be treated as due to that occurrence.

Clause XII of the Excess Policies reads,

> "Occurrence" shall mean an event or continuous or repeated exposure to conditions which unintentionally causes injury, damages, or destruction during the Policy Period which was unexpected by the insured. Any number of such injuries, damages, or destruction resulting from a common cause or from exposure to a substantially the same conditions shall be deemed to result from one occurrence.

Buffalo Marine urges that the second sentence in the Primary Policies demonstrates that the Primary Underwriters by their choice of "occurrence" language and policy limit contemplated that claims/settlements like those here could arise from the "same occurrence," as Plaintiffs have admitted in their memorandum (#20-1 at p.8.). The wording of the Excess Underwriters shows they contemplated coverage for claims/settlements in this matter as being "deemed to result from one occurrence," which was the "common

-25-

cause" of loading contaminated cutter stock at the KMTEX facility onto the barges.

Buffalo Marine notes that the Excess Underwriters attempt to distinguish "claims" and "occurrences," thus admitting that there is ambiguity in the Primary Policies's wording.  Buffalo Marine insists that Excess Underwriters' admission supports Buffalo Marine's contention that the "series of claims" against it "arise from "*the same* occurrence." "If any part of the contract is ambiguous, it must be construed strongly against the insurer" and in favor of the policyholder's, Buffalo Marine's, interpretation. *Aetna Ins. Co. v. Houston Oil & Transport Co.*, 49 F.2d 121, 123 (5th Cir.), *cert. denied*, 284 U.S. 628 (1931).  Moreover, the second sentence of Clause 3 begins with the word, "but," which the *Oxford English Dictionary* defines as "used to introduce something contrasting with what has already been mentioned," and thus applies here to support Buffalo Marine's one-occurrence argument.

"A contract of marine insurance must be interpreted in the light of practical, sound common sense."  *Aetna*, 49 F.2d at 123. Buffalo Marine argues that even if the Court finds the wording sufficiently clear to give effect to the parties' intention, a pragmatic approach would find that in the Primary Policies the phrase, "loss, judgment, settlement, damage, costs, fees, expenses, claims or otherwise arising out of or in consequence of any one occurrence," is synonymous with the Excess Policies' "[a]ny number

of injuries, damages, or destruction resulting from a common cause
or from exposure to substantially the same conditions shall be
deemed to result from one occurrence."  Buffalo Marine maintains
that the object of each of the provisions in their insurance
context is the same as "arising from one originating cause."  The
cause from which the series of losses flowed was the contaminated
cutter stock supplied by the KMTEX facility.[19]

If the Primary Policies fail to provide coverage, the
bumbershoot Excess Policies drop down as the primary layer clearly
avoiding coverage for one occurrence.  Thus Excess Underwriters'
contention about the issue of "occurrence" under the Primary
Policies' wording contradicts their own selected policy wording.
If the Court concludes there is only one occurrence, Buffalo Marine
will owe one $25,000 "per occurrence" deductible, while the Primary
Underwriters will owe $1,000,000 "per occurrence" policy limit

---

[19] In their opposition (#23 at p.3), the Excess Underwriters
reject Buffalo Marine's attempt to say the two entities' policies'
language means the same thing and that Excess Insurers and Primary
Insurers "must have intended to treat the 'occurrence' issue in the
same way" as "contrary to logic."  The Primary Policies and the
Excess Policies are "entirely separate contracts" and there "is no
evidence that the Primary Insurers even knew [or cared] what the
Excess Policies said, ""much less that they intended to determine
the number of occurrences in the same way." *Id*. at pp. 3-4.  Their
interests are not the same and thus they would not define
"occurrence" in the same way.  Moreover the Primary Policies
clearly do not define "occurrence."  Moreover language like that in
the Excess Policies requires treating exposure to similar
conditions as a single occurrence, as in *Westchester Surplus, Puget
Plastics Corp.*, *Foust*, and *Lee Way* (all discussed *infra*) while
language similar to that in the Primary Policies requires each
occurrence to be treated separately, as in *Pincoffs*.

(minus the applicable deductible), and Excess Underwriters will owe the balance of all the claims.  If the Court concludes that there were four occurrences, Buffalo Marine will owe four $37,500 "per occurrence" deductibles[20] (and no separate Hull & Machinery deductibles), Primary Underwriters will owe up to $1,000,000 (less the applicable deductible) for each of the four barges for claims arising out of each barge, and Excess Underwriters will be responsible for any claims in excess of $1,000,000 for each of the four barges.  If the Court adopts Excess Underwriters' argument that there were seventeen separate occurrences, Buffalo Marine would owe seventeen P&I $25,000 deductibles, totaling $425,000 (in addition to four $25,000 Hull & Machinery deductibles, resulting in another $100,000); Primary Underwriters would be responsible for each of the seventeen separate claims up to $1,000,000 each, less the applicable deductible; and probably Excess Underwriters would have no exposure for all but one of the seventeen claims  brought against Buffalo Marine—possibly less than Buffalo Marine's $525,000 payment.[21]

The Insuring Clause in the Primary Policies, with emphasis added by Buffalo Marine, provides,

---

[20] Buffalo Marine's per occurrence deductible would be a maximum of $37,500 under Section II, as the loss is a combined Hull/P&I claim due to the need to clean the barges. #4-1 at p. 13.

[21] Primary Underwriters protection and indemnity coverages are written on a traditional marine SP-23 Form.

> . . . [T]he assurer [Primary Underwriters] hereby
> undertakes to make good [indemnify] to the assured
> [Buffalo Marine] for all such loss and/or damage and/or
> expense as the assured shall as owner of the vessel named
> herein have become liable to pay and shall pay ON ACCOUNT
> OF THE LIABILITIES, RISKS, EVENTS AND/OR HAPPENINGS
> HEREIN SET FORTH . . . .

#4-1, 4-2, and 4-3.  Buffalo Marine observes that while the rest of

SP-23 P&I policy terms may add, subtract or qualify specific

aspects of coverage, the foundation for all coverage is the "any

liability, risk, event or happening" language.  Therefore it urges

the Court to begin any analysis of the policy with a determination

whether the liability, risk, event or happening for which indemnity

is sought was incurred by Buffalo Marine in its capacity as owner

and operator of the four scheduled barges.  The event/happening

(occurrence) according to Buffalo Marine was the receipt of the

contaminated cutter stock from the common source, the KMTEX

facility, that resulted in contamination of Buffalo's barges and

internal components and was the event/happening leading to all of

the downstream claims, including the Hull & Machinery claims for

cleaning of the barges.  *The Oxford English Dictionary* defines

"event" as "a thing that happens, especially one of importance";

"happening" as "an event or occurrence"; and "cause" as "a person

or thing that gives rise to an action, phenomenon, or condition;

that which produces an effect."   A phenomenon may be both an

event/happening and a cause.

    Buffalo Marine asserts that the event/happening out of which

the losses, damages and claims necessitating settlement has to be a cause and that the cause here is "but for" cause--the supply of contaminated cutter stock from the common loading source at KMTEX.[22] The continuing transportation by Buffalo Marine, unaware of the contamination, of the bunker fuel oil in the four barges gave rise to the condition which resulted in contamination of subsequent cargoes that would normally not have experienced that phenomenon. The receipt of the contaminated cutter stock into the four barges was the event (occurrence) and was something that "happened" at a particular time, at the same particular place and in the same particular fashion.  If the four barges had not received the cutter stock, there would be no losses or damages.  Thus the cause and the event refer to the same phenomenon.

In sum, Buffalo Marine contends that under either strict application of the wording of the Primary Policies or under an ambiguity theory, the Court should conclude there was only one "occurrence."[23]

---

[22] In contrast, focusing on the same passage, the Excess Underwriters argue that the policy only provides coverage for the amounts that Buffalo Marine "might become liable to pay."  They contend that Buffalo Marine therefore would not be liable for the contamination of its own barges, but would only become liable after the bunkers were loaded onto its barges and contaminated by the cutter stock residue.

[23] In their opposition (#24 at p. 2), Primary Underwriters disagree with Buffalo Marine's single-occurrence determination. They contend that "the nature of a protection and indemnity policy establishes the liability of the policyholder flows through individual vessels."  Because there were four Buffalo Marine barges

**Primary Underwriters' Cross Motion as to Excess Underwriters and Motion for Summary Judgment Against Buffalo Marine (#20)**

As noted, the Primary Policies do not define "occurrence." Like Buffalo Marine and citing the same passage, Primary Underwriters state that their insuring obligation under their Policies Nos. MS-S3211 and MS-S3514, SP-23 (revised 1/56) is not "occurrence"-based, but instead based on circumstances which require them to indemnify the policyholder for specific enumerated perils (emphasis added by Primary Underwriters):

> . . . [T]he assurer hereby undertakes to make good to the assured . . . such loss and/or damage and/or expense as the assured <u>shall as owners of the vessel named therein</u> have become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth . . . .

Although not relevant to triggering coverage for the Primary Policies, "occurrence" is relevant to establishing that the policy limits exist on a per "occurrence" basis (emphasis added by Primary Underwriters):

> Notwithstanding anything contained herein to the contrary, liability hereunder in respect of any or all loss, judgment, settlement, damage, costs, fees, expenses, claims or otherwise arising out of or in consequence of any one occurrence shall in no event exceed $1 million dollars per occurrence. For the purpose of this clause, each occurrence shall be treated separately <u>but a series of claims hereunder arising from the same occurrence shall be treated as due to that occurrence.</u> *Policies Nos. MS-S3211 and MS-S3514, SP-23,*

---

involved in the cutter stock/bunker fuel transfers, Buffalo marine's liability exists through all four, and thus there are four occurrences in this scenario. *Id.*

*p. 29 (Section II-P&I/MARINE LIABILITIES 4. LIMITATION OF LIABILITY.)*

In contrast, the Excess Policies' indemnity obligations is triggered by an "occurrence":

II. **LIMIT OF LIABILITY**

Subject to the limit of liability stated in the DECLARATIONS, the company shall be liable for Ultimate Net Loss each Occurrence excess of the underlying limits. *Policy Nos. MS-S3213(b) and Policy No. MS-S3516(B).*

Once the primary insurance is exhausted by the expenditure of its $1 million limits, the excess policy will respond for that "occurrence," which is defined in the Excess Policy as follows (emphasis added):

XII. **OCCURRENCE**

"Occurrence" shall mean an event or a continuous or repeated exposure to conditions which unintentionally causes injury, damages or destruction during the policy period which was unexpected by the insured. <u>Any number of such injuries, damages or destruction resulting from a common cause or from exposure to substantially the same conditions shall be deemed to result from one occurrence.</u> *Policy No. MS-S3213(b) and Policy No. MS-S3516(b). INSURING AGREEMENT XII.*

Although the Primary Policies do not define "occurrence," the language of both primary and excess policies contemplate situations involving multiple claims emanating from a single "occurrence."

Primary Underwriters sum up the competing theories: Buffalo Marine argues there is only one occurrence because all of the claims derive from the contaminated cutter stock loaded onto Buffalo Marine's barges at the KMTEX facility; Primary Underwriters

contend there are four occurrences corresponding to the number of barges participating in the transportation of the contaminated bunkers; and the Excess Underwriters maintain that each separate delivery of the contaminated bunkers was a separate occurrence (seventeen to date).   Arguing that the "cause" test is the most accepted and that Buffalo Marine and the Primary Underwriters' views are consistent with it, while the Excess Underwriters' theory is consistent with the effects theory of occurrence, the Primary Underwriters cite A. Windt 3, *Insurance Claims and Disputes*, 5th Section 11:24 (2012) for the general rule that the vast majority of courts have concluded that in the absence of policy language to the contrary, the number of occurrences is determined by referring to the cause or causes of damage rather than the number of individual claims or injuries.   The parties agree that the law of Texas controls here and that Texas follows the "cause" approach. *Westchester Surplus*, 722 F. Supp. 2d at 794.   Primary Underwriters insist that while the original and exclusive source of all claims asserted against Buffalo Marine flow from the shore tank at the KMTEX facility, "the cause in fact of the downstream claims was the continuing, uninterrupted presence of the contaminated bottoms in the four barges."   #20 at p. 13.   They maintain that "Buffalo's conduct, in allowing the 'contaminated' cutter stock aboard its barges, is what set the whole claim train in motion."   *Id.* at p. 14.

In addition to discussing Primary Insurers' interpretations of *Westchester Surplus*, 722 F. Supp. 2d 787, *Nat'l Union Fire Co. of Pittsburgh, PA v. Puget Plastics Corp.*, 649 F. Supp. 2d 613, *Pincoffs*, 447 F.2d 204, and *Prudential Lines*, 158 F.3d 65, as summarized in footnotes above as they relate to the other parties' cited authority for determining the number of "occurrences," Primary Underwriters further rely on *Foust v. Ranger Ins. Co.*, 975 S.W. 2d 329 (Tex. App.--San Antonio, 1998, rev. denied), and *Transport Ins. Co. v. Lee Way Motor Freight, Inc.*, 487 F. Supp. 1325 (N.D. Tex. 1980).

In *Foust,* the insurance policy defined occurrence as "a sudden event or repeated exposure to conditions involving the aircraft during the policy period, neither expected or intended by [Lindeman], that causes bodily injury or property damage to others during the policy period.  All bodily injury or property damage resulting from the same general conditions will be considered to be caused by one occurrence."  Walters Farm hired Lindeman to dust its milo crop with herbicide.  On a single day, May 14, 1994, in less than three hours Lindeman applied the herbicide by a crop dusting plane in several passes over the Walter Farms' property, returning to reload with herbicide between the passes.  The herbicide drifted over to crops on an adjoining property and damaged the McDaniels' cotton crop.  The McDaniels argued that the temperature, wind, and altitude varied during the different passes as the plane landed and

reloaded several times and flew at different altitudes over different sections of the property, and therefore the case did not fall under the "same general conditions," but that each return to the air after reloading with herbicide was a new "occurrence." The court disagreed, found that the herbicide was applied at one time in a process involving several passes, a single procedure, that caused the damage to McDaniels' cotton crop, and thus the damage was the result of a single occurrence under the Ranger insurance policy at issue. Primary Underwriters analogize the instant case to *Foust*, arguing that the contaminated tank bottoms in each of the four Buffalo Marine barges was under the "same general conditions" and a new occurrence did not result each time a load of bunker fuel was placed in the barges because the "same general conditions" of the contaminated tank bottoms was continuously present.

In *Lee Way*, the insurance policy defined occurrence as "an accident or a happening or event or a continuous or repeated exposure to conditions which . . . result[] in personal injury . . . during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." 487 F. Supp. at 1327. The district court, applying a "cause" analysis, determined that repeated acts of racial discrimination against forty-seven employees constituted a single occurrence of discrimination under the insurance policy. It determined that the "pattern and practice

-35-

of discrimination found to have occurred consisted of generalized discriminatory policies routinely followed," such that "[m]inority employees suffered a 'continuous or repeated exposure to such discriminatory conditions and thus there was only 'one occurrence.'" *Id.* at 1329.  The court found that the pattern and practice of discrimination constituted a single occurrence  because all exposure "to substantially the same general conditions" shall be deemed "one occurrence" for purposes of the policy's deductible and limits of liability provisions *Id*.  The court pointed out that "[t]he fact that the parties provided for a 'per occurrence' deductible, as opposed to a 'per claim' deductible, is further indication that the parties intended that Lee Way's discriminatory practices would be deemed a single occurrence.  The $25,000.00 deductible 'per occurrence' suggests that the policy was not intended to define coverage on the basis of individual instances of discrimination." *Id.*

The general rule is that when there is ambiguity in an insurance policy, the interpretation which favors the policyholder will be given effect.  *INA of Texas v. Leonard*, 714 S.W. 2d 414, 416 (Tex. App.--San Antonio 1986, writ ref'd n.r.e.).  Because Buffalo Marine, Excess Underwriters, and Primary Underwriters have reached different conclusions about the number of occurrences as applied to the Primary Policies at issue here, Primary Underwriters suggest that there is an ambiguity made apparent in their differing

-36-

interpretations of the policy, i.e., more that one reasonable interpretation of the language of the policies regarding their response to downstream damage claims.[24]

In sum, Primary Underwriters reiterate that under Buffalo Marine's policy the insured's conduct as an owner/operator of a scheduled vessel triggers coverage and thus "occurrences" assigned to a vessel liability event are limited to the conduct of the individual vessels, i.e., Buffalo Marine's four barges, which caused the loss. The cutter stock contaminants that settled into the bottoms of these barges, whether or not through Buffalo's fault, "caused" the contamination of all the ensuing loads of bunker fuel transported by those barges, which were then transferred to the downstream recipients that have made claims against Buffalo.

Primary Underwriters observe that nearly all of the

---

[24] Primary Underwriters urge the Court to apply the Doctrine of "Reasonable Expectations," i.e., "a principle by which policy language is construed in accordance with the objectively reasonable expectations of the insured." The Court does not summarize the Primary Underwriters' argument here because Texas does not recognize the doctrine. *Certain Underwriters at Lloyd's of London v. Kutchins Enterprises*, No. 4:08-CV-143-A, 2008 WL 5381244, *5 (N.D. Tex. Dec. 22, 2008), *citing Constitution State Ins. Co. v. Iso-Tex Inc.*, 61 F.3d 405, 410 (5th Cir. 1995)("Texas law does not recognize coverage because of 'reasonable expectation' of the insured"), *citing Forbau v. Aetna Ins. Co.*, 876 S.W. 2d 132, 134 (Tex. 1994) ("Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to *create* an ambiguity.")(emphasis in original).

authorities addressing a single versus multiple occurrence situation involve insurance policies which define "occurrence." Here the Primary Underwriters' P&I Form does not contain a definition,[25] but instead references "occurrence" only in connection with its limit of liability and deductible provisions.  They have distinguished *Prudential* on the grounds that it was based on a factual finding of a course of dealing between the policyholder and the P&I Club and it was an occupational disease case rather than a property damage case; *Pincoffs* on the grounds that it narrowly defined "occurrence" as limited by terms such as "accident" or "per claim."  They further emphasize that Excess Underwriters clearly defined "occurrence" in their policy because it is the event that activates their layer of coverage of loss; to fit their purposes Excess Underwriters take the Primary Underwriters' "benign non-definition of 'occurrence'" and "twist it to the detriment of the assured and Primary Underwriters while seeking the benefit of a situation in which their policy wording would clearly respond on at least a four 'occurrence' basis and arguably a single 'occurrence' as suggested by Buffalo."  #20-1 at p. 28.  Primary Underwriters urge the Court to look to the loss circumstances to determine the number of occurrences.

---

[25] In their opposition, Primary Underwriters argue that the Court is therefore not constrained in determining the number of occurrences by precedent that depends on specific policy wording; instead the focus should be on the cause of the losses, which "more often than not, . . . is a single act or omission."  #24 at p. 4.

## Court's Decision

Given the nature, the language and structure of the Primary Policies, and the applicable law, the Court concludes that Excess Insurers' motion for summary judgment should be granted as follows, and that the other parties' motions denied.

As noted, the contention that because the parties have differing interpretations of the policy the policy is ambiguous is legally incorrect. *Columbia Gas*, 940 S.W. 2d 587, 589 (An ambiguity does not arise simply because the parties disagree in their interpretations of it.); *Forbau*, 876 S.W. 2d at 134("[N]ot every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity. Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to create an ambiguity."). Nor does the fact that "occurrence" is not defined in the Primary Policies make it ambiguous. When a term is not defined in an insurance policy, courts use the ordinary and generally accepted meaning.[26] *Pennzoil-Quaker State Co.*, 653 F.

---

[26] *Webster's New World Dictionary Third College Edition* defines "occur" as "1. to be found; exist . . . 2. to present itself; come to mind . . . 3. to take place, happen." It defines "occurrence" as follows:

(1) the act or fact of occurring 2. something that occurs . . . .
*SYN*.--occurrence is the general word for anything that happens or takes place [an unforeseen *occurrence*]; an **event** is an occurrence of relative significance, especially one growing out of earlier happenings or

Supp. 2d at 701, *citing Gonzalez v. Mission Am. Ins. Co.*, 795 S.W. 2d 734, 736 (Tex. 1990); *Prudential*, 158 F.3d 79.  Given this plain, ordinary, and general meaning, the Court finds inapposite those cases in which the insurance policies defined "occurrence" in distinctly different ways, usually in narrower and more specific manner.[27]  Morever, the Primary Policies and the Excess Policies are distinct policies from different underwriters, and there is no basis for importing the definition of "occurrence" in the latter to the Primary Policies.  Finally, there are varying definitions of "occurrence" in liability insurance policies generally; "[t]hat the term is given differing constructions in different cases involving different policies is not surprising and does not demonstrate that the term is ambiguous in [a] particular policy . . . ."  *Allstate*

---

conditions [the *events* that followed the surrender]; an **incident** is an occurrence of relatively minor significance, often one connected with a more important event [the award was just another *incident* in his career]; an **episode** is a distinct event that is complete in itself but forms part of a larger event or is one of a series of events [*an episode* of his childhood] a **circumstance** is an event that is either incidental to, or a determining factor of, another event [the *circumstances* surrounding my decision].

[27] For example in *H.E. Butt Grocery*, 150 F.3d at 529, the policy defined "occurrence" as "an event including continuous or repeated exposure to conditions, which result[s] in Personal Injury or Property Damage during the policy period, neither expected nor intended from the standpoint of the Insured.  All Personal Injury or Property Damage arising out of the continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence."  This definition is similar to the one in the Excess Policies.

*Ins. Co. v. Hicks*, 134 S.W. 2d 304, 309 (Tex. App.--Amarillo 2003).

For the reasons stated below, the Court finds that the Primary Policies are not ambiguous, but the parties differing interpretations are the result of confusion about the applicable legal standard under Texas law for liability policies. The Primary Policies were worded so that they can be given a definite meaning or a certain legal meaning. *Likens v. Hartford Life and Acc. Ins. Co.*. 794 F. Supp. 2d 720, 725 (S.D. Tex. 2011), *aff'd*, 688 F.3d 197 (5th Cir. 2012).[28]

"Texas courts agree that the proper focus in interpreting "occurrence" is on the events that [1] cause the injuries and [2] give rise to the insured's liability rather than on the number of injuries." *H.E. Butt Grocery*, 150 F.3d at 530, *citing Pincoffs*, 447 F.2d at 206. In determining the number of occurrences under insurance policies, Texas distinguishes between insurance policies covering damage to property of the insureds and insurance policies protecting insureds from liability to others, such as the Primary Policies in issue here. *U.E. Texas One-Barrington, Ltd. v. General Star Indemnity Co.*, 332 F.3d 274, 279 (5th Cir. 2003)(Smith, J., concurring in part and dissenting in part). In the former, it applies the "cause" test to determine the number of occurrences based on the number of events that caused the losses in dispute.

---

[28] If the policies were ambiguous, the result would be the same as that reached by the Court here:  they would be construed in favor of the insured against the Primary Underwriters.

*Id., citing Goose Creek*, 658 S.W. 2d at 340-41.  For the liability insurance policies, the court determines the number of occurrences by finding the number of "events or incidents for which the insured is liable."  *Id.* at 279 & n.1*, citing Pincoffs*, 447 F.2d at 206 (holding that the separate sales of contaminated bird seed that gave rise to the liability claims against the insured were each occurrences, while rejecting the argument that the event that caused the contamination was the sole occurrence).  This approach of identifying the events which gave rise to liability claims against the insured has been characterized as the "liability-triggering event" test.  *Id.* at 279*, citing H.E. Butt Grocery*, 150 F.3d at 535 (court rejected insurance company's argument that employer's negligence in hiring and retaining pedophilic employee who molested two children was one occurrence and concluded that the molestation of each child was a separate occurrence); *id.* at 535 (Benavides, J. concurring)("I would hold that the appropriate test for counting occurrences under Texas law is a 'liability-triggering event' rather than the 'immediate cause' test" [although with the same result] and would find "there were two occurrences:  the employee's molestation of each child."); and *State Farm Lloyds, Inc. v. Williams*, 960 S.W. 2d 781, 784-85 (Tex. App.--Dallas 1997, writ dism'd by agr.)(relying on *Pincoffs* in finding that two gunshots fired by one person, each shot hitting a different person, constituted two liability-triggering occurrences under the

policy).[29]

Thus the Court concludes that *Pincoffs* controls here.  As the *Pincoffs* court found regarding the load of contaminated bird seed in that case, here as long as Buffalo Marine retained possession of the bunkers, there was no liability to third parties for which Primary Underwriters had to indemnify it.  After the barges became contaminated, each loading, resulting contamination, and delivery, i.e., each shipment and delivery of the contaminated bunkers to each customer, created liability for Buffalo Marine.  *See Michigan Chemical Corp. v. American Home Assur. Co.*, 728 F.2d 374, 383 (6th Cir. 1984)(applying Illinois law but using "cause" test)(analogizing to the situation in *Pincoffs*, concluding that insured's shipment of contaminated livestock feed to farmers resulting in claims by farmers against the insured and concluding that each shipment constituted an act from which liability arose and thus a separate "occurrence" under the policies).

The language of the Primary Policies further supports this conclusion.  As an initial matter, Primary Underwriters' obligation to insure Buffalo Marine under their Primary Policies Nos. MS-S3211 and MS-S3514 did not arise until Buffalo Marine, as the owner and

---

[29] In *U.E. Texas One-Barrington*, 332 F.3d at 279 n.1, Judge Smith distinguishes the holding in *Foust*, 975 S.W. 2d at 334 & n.3 ("finding that multiple passes by a crop duster together formed one occurrence) from that in *Williams*:  the *Williams* policy did not define occurrence, whereas the definition of occurrence found in the policy at issue [in *Foust*] included 'repeated exposure to [the same general] conditions.").

operator of the four scheduled barges became "liable to pay" for
loss or damage that they caused to the cargoes of third parties.[30]
As noted *supra*, the Insuring Clause in the Primary Policies
provides,

> . . . [T]he assurer [Primary Underwriters] hereby
> undertakes to make good [indemnify] to the assured
> [Buffalo Marine] for all such loss and/or damage and/or
> expense as the assured shall as owner of the vessel named
> herein have become liable to pay and shall pay on account
> of the liabilities, risks, events and/or happenings
> herein set forth . . . .

#4-1 at p. 35, #4-2 at p. 36.  Thus the determination of the number
of "occurrences" under the Primary Underwriters' liability policies
is at what points did Buffalo Marine, through transportation of
cargo on its barges scheduled under the Primary Policies, become
liable to pay for damage to third parties of a nature covered under
the policies.  Only after Buffalo Marine becomes liable to a third
party do Primary Underwriters have an obligation to pay for damage
or loss covered by the policies.  Under Section II–P&I Marine
Liabilities, the first paragraph[31] states, "'It is understood and
agreed that Protection & Indemnity coverage hereunder shall include
loss of or damage to third-party cargo including, but not limited
to, loss during loading, transit and discharge and loss due to

---

[30] As noted, Buffalo Marine did not manufacture or sell the
cutter stock.   Neither Buffalo Marine nor its barges caused nor
were responsible for the contamination in the KMTEX Marine Storage
Facility in Port Arthur, Texas.

[31] The statement was amended to replace Clause 8 of SP-23.

contamination."   #4-1 at p. 29; #4-2 at p. 30.   Under this standard, Buffalo Marine did not become liable to third parties when it loaded its four barges on four separate dates with the contaminated cutter stock; it only became liable when it subsequently loaded third parties' bunkers into each of the uncleaned four barges, contaminated those bunkers, and delivered them to the third parties.

Buffalo Marine's argument that there was only one "occurrence" because all four barges obtained their cutter stock from a common facility fails because coverage under the Primary Policies does not begin until Buffalo Marine incurs liability to third parties for damage to or loss of their cargo during transport by its barges.   The filling of the barges with cutter stock is analogous to the delivery of contaminated bird seed from Argentina to the Maurice Pincoffs Company in *Pincoffs*.   The contamination of the barges did not make Buffalo Marine liable to bunkers customers; instead the later loadings of bunkers on the four contaminated barges and delivery of them to customers gave rise to Buffalo Marine's liability here.   Moreover, there was not a single happening that resulted in damage to customers' bunkers; the four separate barges were loaded with the contaminated cutter stock on different dates, and their residue subsequently contaminated later loaded bunkers at varying times, and they delivered the contaminated bunkers to different customers at divergent times.

The claims arising from the deliveries of each barge where they are not causally related should be seen as separate occurrences.  Each instance of loading, transporting, and delivering a customer's bunkers was a separate event, with new loadings between jobs.  Each of the four barges in the instant action operated the way the Maurice Pincoffs Company in *Pincoffs* did.

"Occurrence" is used in the Primary Policies to establish policy limits, as indicated in the third paragraph:

> Notwithstanding anything contained herein to the contrary, liability hereunder in respect of any or all loss, judgment, settlement, damage, costs, fees, expenses, claims or otherwise arising out of or in consequence of any one occurrence shall in no event exceed $1 million dollars per occurrence.  For the purpose of this clause, each occurrence shall be treated separately but a series of claims hereunder arising from the same occurrence shall be treated as due to that occurrence.

*Id.; id.*

Accordingly, for these reasons stated, the Court

ORDERS that Excess Insurers' motion for summary judgment (#18) is GRANTED and the other parties' motions(#20 and 21) are DENIED.  The Court further orders that Excess Insurers shall submit within twenty days a proposed final summary judgment.  The other parties shall have ten days from the date that the proposed judgment is

filed to file any objections.

     **SIGNED** at Houston, Texas, this <u>12th</u> day of <u> September </u>, 2013.

                                                    _____

                                                      MELINDA HARMON
                                      UNITED STATES DISTRICT JUDGE